Nicholson, C. J.,
delivered the opinion of the Court.
This' is an application to a court of equity for relief *323 against tbe enforcement of a judgment at law, which is alleged to be unjust and inequitable. There can be no controversy now, as to the jurisdiction of Courts of Chancery in such cases; nor is there any difficulty in ascertaining the general rule by which courts of equity in this State are governed in the exercise of this jurisdiction.. The real difficulty is, in the application of the rule, in each particular case, in which the exercise of the jurisdiction is invoked.
The rule as laid down in Kearney v. Smith, 3 Yer., 139, may be regarded as fully established, by numerous subsequent recognitions of it in this State. The rule so established is, that “a party will not be aided by a Court of Chancery, after a trial at law, unless he can impeach the justice of the verdict, on grounds of which he could not have availed himself at law, or was prevented from doing it by fraud, or accident, or the act of the opposite party, unmixed with negligence or fraud on his part.”
It is manifest that the jurisdiction of a Chancery Court can never be successfully invoked until it is made clearly to appear that injustice has been done by the judgment in the court of law. Before a Court of Chancery will entertain an appeal to its remedial powers, in a case which has already been tried in a court of law, it must see that injustice has been done.
In the case before us, the complainant has shown clearly and distinctly, that the judgment which he seeks to enjoin was rendered on a note, on which he was never legally bound; that his name was affixed to it without his knowledge or authority, and that the act has never *324 been recognized or assented to by him. The injustice of the judgment, therefore, is fully made out.
But as clearly as the injustice of the judgment is made to appear, it is better that complainant should suffer the consequences, than that the fixed rules, which define the jurisdiction of courts of law and of equity, should be broken down. Hence it is incumbent on complainant, not only to show the injustice of the judgment at law, but also, that he was prevented from making his defense by fraud or accident, or act of the plaintiffs; and that he was chargeable with no negligence or fault on his part. In the case before us, it appears that complainant made no defense whatever. The summons was served on him some time in the fall of 1860, yet, down to the January Term, 1861, of the Court, he had taken no preparatory steps for his defense, though he avowed his determination to resist the suit, even at the hazard of sending his son to the penitentiary. It is obvious that, if he had engaged counsel in advance of the meeting of the Court, he could have avoided a judgment at the appearance term, though he might have been prevented by sickness from being in attendance. To determine whether his failure to employ counsel in advance was negligence or not, depends upon the facts and circumstances in proof.
It is shown that he dei’ived his first information as to the existence of the note, from the Sheriff, at the time the summons was served. He promptly repudiated the note, denied his liability, and declared he never would pay it. The Sheriff informed him that Ben. Layne said it was not complainant’s debt, and that he must not pester him about it; but that they (meaning the other makers of the *325 note, including himself,) would pay it. The Sheriff told complainant, that it was not necessary for him to attend' at that Term, which would only be the appearance Term ; that the others would attend to it and put in a plea which would put it off to the nest Term, when he could go and attend to it. It is further proved by the Sheriff, that Ben. Layne instructed him that he was in partnership with George Layne and T. B. Rowland, the other makers of the note, and that it was their debt, and they would pay it.
It is in proof, by witness, Reynolds, that Ben. Layne and Jones, one of the plaintiffs in the suit at law, were present, and saw young Rowland sign his father’s name to the note; and when he did so, saying his father had authorized him, witness looked him in the face, whereupon he turned off, when witness remarked to Ben. Layne that that signature was a forgery. Notwithstanding this significant remark by one who was well acquainted with complainant’s habit of never giving his note, or going security, no further inquiry was made, but the note was received by Jones. As Ben. Layne was a partner in the purchase of the mules, for which the note 'was given, it was to his interest that Jones should receive the note; and for that reason, we may presume, he made no objection to the fraud thus attempted to be perpetrated on complainant for his benefit. It further appears that Jones took the note, without requiring young Rowland to show his authority for using his father’s name.
These facts explain the motive which Ben. Layne had in sending the messages by the 'Sheriff to complainant. *326 He knew that tbe note was a forgery, as to complainant’s signature. He acknowledged that the debt was not complainant’s, but his own; and he authorized■ the Sheriff to assure him that the debt would be paid, and he would not be troubled. In addition to all which, the Sheriff assui’ed him that he need not attend the appearance term, but that the other parties would attend to putting in the necessary pleas.
"Without now inquiring whether this effort on the part of Ben. Layne to induce complainant to hold still, and take no" steps in the case, proceeded from a desire to relieve his mind from anxiety, or whether it was designed to throw him off his guard for a sinister purpose, we have no difficulty in seeing that an old and illiterate man, naturally oppressed by the necessity of subjecting his son to infamy, by fixing upon him the guilt of forgery, in making out his defense, would readily listen to the suggestions of Layne and the advice of the Sheriff, and postpone any preparation for his defense until it became absolutely essential. We are, therefore, satisfied that complainant was chargeable with no such negligence or fault, in failing to employ counsel before the appearance term of the court, as ought to repel him from a court of chan,-cery.
The question still remains, was he prevented by fraud or accident, or by the act of the opposite party, without negligence or fault on his part, from attending and making his defense at the appearance term of the court? The proof is entirely satisfactory, that when the court came on, and during its continuance, complainant was entirely unable, from severe bodily affliction, to attend the court *327 It is shown that after the court commenced, he expressed his determination to go and put in his plea of non est factum; but his sickness continued, and he was thus prevented from going. There can be no difficulty, on the proof, in seeing that 'his excuse for being absent from-court, is sufficient to relieve him of all charge of negligence or fault in not being present. Without being present, he could not put in his plea. His physical condition was such that it was impossible for him to be present, without endangering his life. The law requires no such exposure to danger, to avoid the charge of negligence.
But was he guilty of negligence, in failing to employ some one to attend court and secure the services of counsel, in preventing a judgment by default? It was the appearance term, and nothing could be done beyond making up the pleadings. He had been assured by the Sheriff that there was no necessity for his being present; and he had every reason to believe that Ben. Layne would attend, and take the necessary steps to prevent a judgment by default. Layne had sent him word that the debt would be paid, and had instructed the Sheriff not to trouble complainant. Layne did employ counsel to plead for all the defendants. This was sufficient to secure to complainant an opportunity to make his defense at the next term. But, notwithstanding his knowledge that complainant’s name was forged to’ the note, and that he intended to rely upon that fact, he took advantage of complainant’s unavoidable absence, and consented to withdraw, not only his own plea, but that of complainant, and allowed the plaintiffs to take judgment. The plain *328 tiffs knew that the name of complainant was a forgery, and that he was not bound on the note; they knew that they were not entitled to a judgment at that term, without the consent of all the defendants. Vet, with this knowledge, they consent to take a judgment against complainant, knowing that he was not present to waive his rights; and immediately afterwards an appeal is taken to the Supreme Court, as well for complainant as for the other defendants. All this was done without the knowledge or authority of complainant, whereby he was deprived of all remedy, and an unconscientious advantage secured to the plaintiffs.
These facts not only relieve complainant of all charge of negligence, but they develop a fraudulent contrivance to defeat complainant’s defense, which fully justifies the interposition of a court of chancery. They show that the plaintiffs in the judgment are now seeking to avail themselves of an unconscientious advantage at law, which equity will either put out of the way or restrain them from using. White v. Cahal, 2 Swan, 550.
The judgment will be perpetually enjoined as to complainant. The defendants will pay the costs of this court, and of the court below.